1
2
3
4
5
6
7
8        **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JEFFREY PAUL MARSH,                    No.  2:23-CV-0877-DMC-P

12                  Petitioner,

13        v.                                MEMORANDUM OPINION AND ORDER

14   DANIEL CUEVA,

15                  Respondent.

16

17              Petitioner, a state prisoner proceeding with retained counsel, brings this petition

18   for a writ of habeas corpus under 28 U.S.C. § 2254.  Pursuant to the written consent of all parties,

19   ECF Nos. 6 and 7, this case is before the undersigned judge for all purposes, including entry of a

20   final judgment.  See 28 U.S.C. § 636(c); see also ECF No. 9 (consent minute order).  Pending

21   before the court are Petitioner's petition for a writ of habeas corpus, ECF No. 1, Respondent's

22   answer, ECF No. 11, and Petitioner's traverse, ECF No. 20.  In support of the answer,

23   Respondent has lodged the state court record.  See ECF Nos. 19 and 22.

24              Because this action was filed after April 26, 1996, the provisions of the

25   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

26   See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128

27   F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  Under AEDPA, federal

28   habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

1

1    state court proceedings unless the state court's adjudication of the claim:

2        (1) resulted in a decision that was contrary to, or involved an unreasonable
3        application of, clearly established Federal law, as determined by the
         Supreme Court of the United States; or

4        (2) resulted in a decision that was based on an unreasonable determination
         of the facts in light of the evidence presented in the State court proceeding.
5

6        Under § 2254(d)(1), federal habeas relief is available only where the state court's

7    decision is "contrary to" or represents an "unreasonable application of" clearly established law.

8    Under both standards, "clearly established law" means those holdings of the United States

9    Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 549

10   U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412).  "What matters are the holdings of the

11   Supreme Court, not the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th

12   Cir. 2008) (en banc).  For federal law to be clearly established, the Supreme Court must provide a

13   "categorical answer" to the question before the state court.  See id.; see also Carey, 549 U.S. at

14   76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators'

15   conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test

16   for determining prejudice created by state conduct at trial because the Court had never applied the

17   test to spectators' conduct).  Circuit court precedent may not be used to fill open questions in the

18   Supreme Court's holdings.  See Carey, 549 U.S. at 74.

19       In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

20   majority of the Court), the United States Supreme Court explained these different standards.  A

21   state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

22   the Supreme Court on the same question of law, or if the state court decides the case differently

23   than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

24   court decision is also "contrary to" established law if it applies a rule which contradicts the

25   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

26   that Supreme Court precedent requires a contrary outcome because the state court applied the

27   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court

28   cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at

2

406.  If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S. 510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply.  See Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous.  See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.  As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the

1  state court's summary denial was based on an objectively unreasonable application of that law.

2  See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

3

4  **I. BACKGROUND**

5  A.  **Facts**[1]

6          The following facts are recited by the California Court of Appeal in its opinion on

7  direct review affirming Petitioner's conviction and sentence, and Petitioner has not presented any

8  clear and convincing evidence to rebut the presumption that these facts are correct. The Court of

9  Appeal outlined the facts as follows:

10                          *Prosecution Case*

11          Defendant had three daughters with his wife Martina, Jane Doe
       (Jane), Alyssa, and Heather. When they divorced, Jane was 11 years old,
12     Alyssa was eight years old, and Heather was six years old. Defendant was
       given primary custody of the girls.
13
                              *A. Jane Doe*
14
               Following the divorce, defendant and his daughters lived in a
15     house on Five Mile Drive in Stockton, where Jane had her own room with
       a rose theme. Once when she was asleep, defendant entered the room
16     carrying a coffee cup that smelled of wine. Jane pretended to sleep while
       he touched her vaginal area on the outside of her pajamas. When she
17     opened her eyes and stopped pretending to sleep, defendant gave her a
       drink of red wine from the coffee cup. He then put a vial, similar to a
18     brown oil vial, under her nose and told her to sniff it. She sniffed the vial
       and encountered a strong chemical smell that made her feel lightheaded.
19     Defendant pulled down her pajamas and exposed his genitals. He then put
       his mouth on her vagina and performed oral sex on her. Defendant also put
20     his fingers in Jane's vagina. He next put his penis inside her vagina, which
       was painful and made her want to scream. Jane screamed inside her head
21     as defendant sexually assaulted her. When he finished, there was "wet
       stuff" between Jane's legs; defendant wiped her legs and vagina with a hot
22     washcloth. Jane went to sleep after he left.
               Defendant kept sexually abusing Jane every week until she was 17
23     years old. He generally performed oral sex on her, then placed his penis on
       her face and made Jane suck it, followed by vaginal intercourse. Jane
24     hoped defendant would leave her sisters alone because he was doing this

25          _____
                    [1]        Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
26     by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court
       decision are entitled to a presumption of correctness, rebuttable only by clear and convincing
27     evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the
       burden of rebutting this presumption by clear and convincing evidence. See id. These facts are,
       therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be
28     referred to as "defendant."

                                        4

to her. She did not tell her mother about this during their weekend visits because defendant told Jane she and her sisters would be separated and put in foster homes if she ever reported the abuse.

The sexual abuse continued when defendant moved the family to a two-story home in Galt. Jane had a bedroom next to the family room and defendant would come into her bedroom and sexually assault her after her sisters went to sleep upstairs. Each time defendant assaulted her, Jane would mentally "check out."

Defendant next moved the family to another home in Galt, where Jane had a nice room with big windows. In addition to the continued sexual abuse of Jane he also started a rotation where each girl took turns sleeping in his bedroom. This caused Jane to worry that defendant would start abusing her sisters. Defendant gave her an inhalant and molested her when it was her turn to sleep in his bedroom. Defendant once gave Jane too much inhalant, causing her to believe she was going to lose consciousness.

The landlady at the second Galt home once came over and asked to use defendant's computer. Jane saw the back of the landlady's head while she was at his computer. Later that night, a Galt police officer came over and talked to Jane and her sisters.

In April 2000, Galt Police Detective Garrett Wood contacted defendant regarding a child pornography investigation. Defendant declined to consent to a search of his computer. Jane told the officer everything was fine even though defendant was sexually abusing her because she feared she and her sisters would be split up into different foster homes if she reported the abuse.

Following the investigation, defendant moved the family to his mother's mobile home in Hillsboro, Oregon. Jane and her sisters rarely saw their mother after this move; defendant repeatedly told Jane and her sisters their mother did not want to see them. Defendant was also very likable and charismatic at church, which led Jane to think that no one would believe her if she reported the abuse.

The sexual abuse continued when they were at Jane's grandmother's home. Jane typically slept with defendant in the spare bedroom, where the abuse usually took place. Defendant once sexually abused her in the back of the family's van at a storage unit in Beaverton, Oregon. She did not tell defendant's mother about the abuse because she did not think his mother would believe her.

The family also stayed in hotels and motels. Jane sometimes shared a bed with defendant while her sisters shared the other bed. Defendant would sexually abuse Jane under the covers so her sisters would not notice. Jane remembered this happening in an Oregon Ramada Inn, when she was about 12 years old. Defendant "spoon[ed]" Jane from her behind and put his penis in her vagina at the Ramada Inn.

Jane and her sisters attended many different schools; Alyssa recounted attending 13 different schools from kindergarten to high school. They lived in Lodi, Galt, Stockton, and Elk Grove, Hillsboro and Tigard, Oregon, and in Richfield, Washington. Heather never finished a school year at the same school because of the family's many moves.

Defendant never allowed his daughters to disclose the family's address, having them instead give a P.O. Box. He repeatedly said they had to hide their address because their mother was trying to do bad things to them and get him in trouble. Heather thought defendant was paranoid, as he told her someone was looking for him and that his brother was out to get him. Defendant would not let them see the contents of the many

storage units he had.

Defendant would give his daughters Nyquil before bed, calling it "night-night juice." Defendant gave them Nyquil even when they were not sick. Jane recalled defendant giving her a melatonin pill and Nyquil almost every night.

Defendant worked at many different jobs when his daughters were children. He always had several computers. Defendant would not give the computer passwords to Jane and her sisters and would not let his daughters use them without his permission. When Jane was a sophomore in high school, she once was pasting images from one of defendant's computers for a school project; Jane opened a picture gallery containing many photographs of naked children. Another time she found a picture of a naked little boy that was in defendant's sock drawer.

Defendant did not stop sexually abusing Jane until she turned 17 years old, got a job at Target, and started dating a much older man. Defendant stopped the sexual abuse after Jane made clear to him that she did not want the sexual abuse to continue. When Jane told defendant she intended to report the sexual abuse, defendant asked her to forgive him and forget that it happened.

While they were living in the Shiloh Inn in Tigard, Oregon, Jane came home crying one night and told Alyssa and Heather that she had an abortion. When he found out, defendant got really upset and yelled at Jane. He printed photographs of aborted babies and put them in a Mother's Day card dated April 15, 2004. A few days later, defendant drove to his mother's house, where he had Alyssa and Heather go in the mobile home while defendant remained in the car with Jane. Jane eventually stormed into the mobile home, packed, and left them for good. Defendant told Alyssa and Heather that Jane was a liar and a bad person, and that Jane and their mother were out to get defendant.

Jane lived with her grandmother when she was a junior in high school. She reported the sexual abuse to a pastor after she moved away from her grandmother's home. Jane finally reported the sexual abuse because she was afraid that defendant might sexually abuse her sisters and because the pastor encouraged her to report it to the police.

Tigard Police Detective Gary Way met Jane on May 31, 2004. Jane told Detective Way defendant sexually abused her from the time she was 11 years old until she was 17 years old. She also provided the names of two people whom she had told about the sexual abuse, Pastor Steven Brockdorf and her friend Tammy Long. Defendant was not charged at this time because Detective Way could not find him.

*B. John Doe*

John Doe (John) was born in April 1998 and lived in Auburn. He has a brother, John Doe 2 (John 2), who is four years older. Defendant is their grandfather's brother; John called defendant "Uncle Jeff" when he was growing up.

John remembered defendant visiting his family when he was six or seven years old. Starting when he was eight years old, defendant regularly took John to a 7-Eleven near the fairgrounds to buy him a Slurpee. When John and defendant were alone at John's house, defendant would show John pictures of naked women, telling John he was in relationships with the women in the pictures. Defendant told John how he had sex with them.

6

Defendant also showed pictures of naked women to John when they went to 7-Eleven. He then asked John if defendant could take photographs of him. John wore clothes when defendant first photographed him. Defendant rewarded John with money, a toy, or a video game when he photographed John. Defendant began having John turn around to expose his backside as he posed. The posing progressed to John pulling down his pants and bending over, exposing John's buttocks. This led to defendant taking photographs of John as John had his penis out and his shirt off.

Defendant usually photographed John when they were underneath the stairs in a hallway at John's home. John also posed for defendant on a silver car at a carwash near the 7-Eleven. He posed lying on the hood of the car with his buttocks facing the camera with his hands on his hip. Defendant took many more than 20 photographs of John with his exposed penis and buttocks.

Eventually defendant showed John how to masturbate by masturbating in front of John in the 7-Eleven parking lot. Defendant had John touch himself while defendant was masturbating. John got rewards from defendant for getting an erection and for allowing defendant to photograph his erect penis. Defendant took such photographs at least 10 times. He would tell John to hold or stroke his penis as defendant took the photograph.

Defendant eventually asked John to touch and masturbate defendant's penis, and to perform oral sex on defendant, which John refused. He also rejected defendant's request to perform oral sex on him. John allowed defendant to touch his penis on more than one occasion. At times, defendant would rub John's back, shoulders, leg, and thigh area near his penis.

John was sent to counseling after getting into trouble at high school. He eventually disclosed the sexual abuse to his counselor. John also told his close friend about the abuse. He eventually disclosed the sexual abuse to Auburn Police Detective Jennifer Turner.

John 2 recalled defendant visiting their family in Auburn many times, usually about once a month and staying for the day. He usually visited while their parents were not around. Defendant always took John to 7-Eleven for a Slurpee. John 2 eventually became concerned by the length of their absence when John and defendant went to 7-Eleven. When he was in his teens, defendant showed John 2 pictures of defendant's naked girlfriend on the family's home computer.

*Other Evidence*

Defendant and Alyssa lived in separate residences in Washington in 2016. One night, defendant left her a frantic voicemail asking why she was not answering her phone and that he was going to be arrested. Defendant also wanted Alyssa to pick up a laptop and GPS system from her friend Nate Fear.

Nate Fear knew defendant through Alyssa and would sometimes help defendant with tasks around the home. One night in May 2016, defendant phoned Fear at 1:00 a.m. and said he needed help. When they met, defendant told Fear he was going to be arrested and gave Fear a laptop, a GPS system, and a phone with the memory card ripped out. Defendant told Fear to hold onto the items.

/ / /

7

Fear kept the laptop in his closet for a few months before turning it over to the police. The laptop was in a bag that also held a black SD card, an orange SIM card, a USB card reader with a SIM card installed, and a thumb drive, as well as several photographs of adult male nude models.

Defendant was arrested by Vancouver, Washington Police Sergeant Joseph Graaff on May 12, 2016, at around 12:30 p.m. Defendant was found loading black garbage bags into a black Chevy Impala in a parking lot outside his apartment building. One of the bags contained cut up CDs and DVDs. There were hundreds of CDs in the Impala's trunk. A large duffel bag in the trunk contained sealed bottles containing liquids. Some of the bottles had labels like "Man Scent" and "Jungle Juice," which were terms for inhalants containing amyl nitrate. The fumes of amyl nitrate, also known as "poppers," were used to create a sense of euphoria and increase flow to blood vessels. They were commonly used by persons before engaging in sex.

A USB flash drive, eight SD cards and flash drives, a Maxtor hard drive, and a large box of photographs were taken from defendant's apartment. The apartment manager boxed up defendant's property and moved it to a storage unit after his arrest. The manager found many boxes of black security cameras, as well as remnants of shredded CDs. This unit and another storage unit of defendants in Vancouver Washington were subjected to warrant searches. The storage unit containing property from the apartment found containers or vials, "poppers" and melatonin along with photographs of John at various ages, including three shirtless photos of him in 2003. John's armpits were exposed in two of the photos. There was also a photograph of him leaning against the wall that resembled the wall of the carwash near the 7-Eleven.

Three of the DVDs seized from defendant's possessions could not be viewed as they contained military-grade encryption. A forensic expert was able to retrieve deleted files from a SparQ disk [footnote omitted] of defendant's. The files contained 112 photographs of scantily clad boys and girls posing in various stages of undress and 330 images of child pornography. The images on the disk were described to the jury; 330 images were pornographic pictures of children between the ages of five years old and 16, many of whom were prepubescent. About 90 percent of the children were male. The children were naked or partly naked, in sexual positions alone or with others. In some, children were engaged in sex acts with each other, while others had children in sex acts with an adult male. There were also many pictures of boys with erections, as well as children in poses with their armpits exposed. The remaining 112 images were of child erotica or nudity that did not involve them engaged in sex acts or with exposed genitalia. Some of these had a child exposing the armpit.

Nine sexually explicit photographs of prepubescent boys were found on an SD card in a folder titled, "Zfreunden." One photo was of a boy with an exposed armpit, another of a boy with his penis showing through his pants, and another showed a boy with a visible erection through his Speedo. Defendant also had a white binder of printed photographs of John and John 2. One photo was of the boys holding presents. There was also a photograph of John by the carwash near the 7-Eleven, another of him in a tank top, and a photo of him at the same carwash with exposed armpits. In another photo, John looked like he had just consumed a red Slurpee. There were no nude photographs of John.

///

8

Photos of John were also found in an SD card and from the Maxtor hard drive. The SD card had photos of John shirtless and one of him in boxer shorts, while the hard drive had photos of him at various ages. Other photographs of John were found in the storage unit from the apartment. These included pictures of him at various ages and had photos of him shirtless and of him exposing his armpits. One photo had John standing with exposed armpits against a cinderblock wall similar to the same wall at the carwash by the 7-Eleven.

An electronic file folder labeled "women" contained pornographic and non-pornographic photographs of women exposing their armpits. Detective Turner found defendant had several hundred photos of boys swimming, diving, or wrestling. The focus in each picture was either the boy's armpit or his crotch area. She also found a file folder labeled "Download" containing numerous photographs of wrestlers focused on the crotch. The laptop case contained photographs of male models, a few nude and some with exposed armpits. Two exhibits of photographs of young men and boys with a theme of armpits were presented to the jury.

At the time of his arrest, defendant had downloads for files titled: "The Boys," "lockerroomdogtag.jpg," "towloff.jpg," "marcus-ricci-underwear.jpg," "bulges.jpg," "Wrestling+cock+bulge.jpg," "Speedo-erection.jpg," "Teen-boys-in-speedo-line," "Guybulge," "Boner.jpg," "Naked+twink," "Cute+blond+twink+wanking," "Twink+twink...cumming.gif," "Twinknakedjerk+off," "Teentwinkfucked.gif," and "Nakedtwink...caltorture.gif." [footnote omitted].

Dr. Anthony Urquiza testified as an expert on child sexual abuse. He described the five parts of the Child Sexual Abuse Accommodation Syndrome (CSAAS): secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and recantation or retraction of the abuse allegation.

*The Defense*

Testifying on his own behalf, defendant said he divorced Martina in 1996. He had full custody, with Martina having visitation until March 17, 2005, when she obtained full legal and physical custody of Alyssa and Heather. [footnote omitted]. Defendant opposed Martina having custody because of her physical abuse of their daughters and her poor lifestyle choices. He noticed the girls had bruising and red marks after visiting their mother. Alyssa once vomited after a visit and told defendant that Martina had hit her in the stomach; Martina also dropped Jane into hot bathwater when she was a baby, scalding Jane's legs.

Defendant was not consistently employed, so he would rely on Aid to Families with Dependent Children (AFDC) welfare and often moved to find employment. He also moved to get away from Martina, who harassed defendant and the girls. Jane always slept with defendant's mother when they lived at his mother's mobile home in Hillsboro, Oregon. From his mother's home, defendant moved the family briefly to a rental home in Ridgefield, Washington and then to a manager's apartment in a Tigard, Oregon hotel, where they stayed for two years.

Jane moved in with her grandmother three months before high school graduation. When defendant later learned she had an abortion, he sent Jane a 10-page letter on abortion that contained multiple color photographs of aborted fetuses, a decision he now regrets.

///

Defendant gave Nyquil to the girls when they had a cold or flu and to help them sleep when they lived in the hotel in Tigard, Oregon, which was noisy at night. He occasionally gave them melatonin to help with Heather's nightmares and to help their immune system.

Defendant restricted his daughters from using the computer after they crashed the hard drive. He had a work computer and eventually got another computer for the girls' schoolwork. Defendant used P.O. boxes and mail services for his address because he was afraid of his brother and because Martina's boyfriend was trying to take the girls from school.

Defendant often visited Auburn when traveling to and from Reno. He never showed pictures of naked women to John and never took naked photographs of him. Defendant took both John and his brother to the 7-Eleven for Slurpee's. He gave John gifts only for holidays or his birthday; he never gave John gifts for taking pictures.

According to defendant, Jane and defendant's brother John Marsh orchestrated the sexual abuse allegations against him. Defendant has not had a good relationship with his brother since childhood, and he had threatened defendant several times. Defendant denied all of the allegations of abuse made by Jane and John. He was taking things from his car to his apartment when he was arrested. He admitted having shredded CDs in his apartment on the night before his arrest and having given a computer containing naked pictures of men to Nate Fear in the middle of the night.

Defendant had used a program called CCleaner to clean both of his laptops to speed them up. He owned a SparQ drive from 2001 to 2003 but had not seen it since moving to Oregon. The SparQ drive was in a van that was stolen in 2005 and later recovered without its contents; the SparQ drive admitted into evidence was not defendant's.

The defense played a tape of a call between defendant and Alyssa when defendant was in jail. Defendant maintained his innocence during the call. When Alyssa brought up "poppers", defendant said that he and Martina loved using them when they lived in Lincoln City.

Recalled as a defense witness, Jane said she contacted her mother a few days before leaving her grandmother's house. Her grandmother had asked her to leave at defendant's direction. When she reported the sexual abuse to the police on June 1, 2004, Jane had already told the pastor and Martina. Defendant gave her the Mother's Day letter before this. Jane helped Martina by testifying in the custody proceedings following Jane's allegations.

John was also recalled by the defense. His grandfather, defendant's brother John Marsh, reported John's allegations to the police without John's knowledge, but had discussed the report with John's parents. John had discussed the allegations with John Marsh, who was "blinded by rage."

Dr. Deborah Davis, a psychology professor at the University of Nevada, Reno testified as an expert on memory. False memory had been documented in individual reports of sexual abuse. Deliberately false reports could be motivated by dislike of the accused, or a need for attention or revenge. Unintentional false reports could be caused by a misinterpretation of a person's actions or could be triggered by a parent or therapist suggesting abuse to the child or persistently questioning the child about abuse. False reporting could also be caused by negative family dynamics such as divorce or custody issues.

///

10

1
2
3
4
5
6
7
8

> People remember things differently and memory fades over time, becoming a self-told narrative supported by a few images. Memory is also easily distorted and can be created. Interpretation of a childhood event as sexually motivated might be difficult, as the child might lack the knowledge to correctly interpret the event. Discovery that there are other abuse allegations against the person may make memory of abuse by that person more plausible.
> Dr. Alan Donelson testified as an expert on pharmacology and toxicology. Nyquil's formula varied over time and over the intended consumer. From 1996 to 2005, children's Nyquil contained no sleep-inducing ingredients. Melatonin is no more effective than placebos for inducing sleep.

ECF No. 22-6, pgs. 2-11.

9
10

**B.**     **Procedural History**

The California Court of Appeal recited the following procedural history:

11
12
13

> Following a jury trial, defendant was convicted of 26 counts of lewd acts on a child (Pen. Code, § 288, subd. (a)) [footnote omitted] with multiple victim allegations (§ 667.61, subd. (e)(4)) and one count of using a minor to pose for sex acts (§ 311.4, subd. (c)). The trial court sentenced him to 180 years to life in state prison.

14

ECF No 22-6, pg. 1.

15
16
17

On February 9, 2022, the California Supreme Court denied review without comment or citation.  <u>See</u> ECF No. 22-7, pg. 1.  Petitioner did not file any state court post-conviction actions.

18
19

**II.  DISCUSSION**

20
21
22
23

Petitioner raises two claims as follows: (1) the repeated failure of the trial court to substitute appointed counsel under <u>Marsden</u> violated Petitioner's Sixth Amendment right to counsel; and (2) prejudicial admission of child pornography evidence by the trial court deprived Petitioner of his Fourteenth Amendment right to a fair trial.  <u>See</u> ECF No. 1, pg. 38.

24

**A.**     **Denial of Substitution of Appointed Counsel**

25
26
27
28

"A State has a duty to provide an indigent defendant with effective assistance of counsel through his first appeal."  <u>Hendricks v. Zenon,</u> 993 F.2d 664, 669 (9th Cir. 1993) (citing <u>Douglas v. California,</u> 372 U.S. 353, 358 (1963)).   In California, a criminal defendant who is dissatisfied with court-appointed counsel must be permitted to state the reasons why the

1  defendant believes the attorney should be replaced.  See People v. Marsden, 2 Cal.3d 118, 123-

2  24 (1970).  When a defendant seeks to discharge counsel and substitute another attorney on the

3  ground of inadequate representation, the court is required to allow the defendant to explain the

4  basis for the motion and relate specific instances of the attorney's deficient performance.  See id.

5  Substitution is appropriate where the defendant can show a breakdown in the attorney-client

6  relationship or "an actual conflict of interest. . . ."  Wood v. Georgia, 450 U.S. 261, 273-74

7  (1981).  Mere disagreement or friction between client and counsel is insufficient ground for

8  substitution.  See Morris v. Slappy, 461 U.S. 1, 13-14 (1983).  Denial of a Marsden motion can

9  only amount to a constitutional violation where there was a conflict between the defendant and

10  counsel which prevented effective representation.  See Schell v. Witek, 218 F.3d 1017, 1026 (9th

11  Cir. 2000) (en banc).

12      Addressing Petitioner's Marsden claim on direct appeal, the California Court of

13  Appeal stated as follows:

14      Defendant contends his conviction must be reversed because the
        trial court erroneously denied all of his *Marsden* motions regarding the

15      counsel who represented him at trial. [footnote omitted].

16      *A.  Background*

17      *1.  January 29, 2020, Hearing*

18      Defendant's first *Marsden* motion against trial counsel was heard
        on January 29, 2020. At the hearing, defendant said the claims against him

19      were false, having been orchestrated by his brother, his ex-wife, and by
        Jane following a period of bad behavior by her. He complained that his

20      attorney, John Lyman, had not investigated many options for exculpatory
        witnesses and documentation. Defendant had never met with a defense

21      investigator, and, while Lyman met with him several times, the visiting
        booth was not soundproof.

22      Defendant complained that he had not been informed of defense
        strategy or allowed to make any informed, meaningful decisions about the

23      defense. Lyman's firm had also served the district attorney's office with a
        defense game plan that was supposed to be sealed and given only to the

24      court. Lyman had not contacted his ex-wife's boyfriend or expert
        witnesses he suggested regarding the lifetime stress induced by abortion,

25      the effect of physical and emotional abuse on a girl by her mother, and a
        pharmacological expert who could explain the effects of children's Nyquil

26      and melatonin. He also claimed there was exculpatory evidence in the
        Colusa County Sherriff's Department and family law and custody files.

27

28  / / /

12

Defendant gave the name of witnesses who could establish his van had been stolen and had contained the data storage device later found in his residence. He also wanted counsel to interview several other potential witnesses, including John and Nate Fear. Finally, defendant wanted a copy of Jane making a graduation speech as well as photos of John in precocious poses taken by his parents, and for Lyman to retain a computer expert to examine the various data storage devices.

Lyman replied that upon getting the case file a year ago, he hired an investigator to start from scratch by recontacting witnesses and finding people who had not been interviewed. He since had one of his junior investigators visit defendant with pertinent documents. Lyman had visited defendant 12 times and spoke with him on the phone twice. He had an investigator locate the 17 people defendant had on a witness list, but not all of those potential witnesses had relevant testimony.

Lyman had explained to defendant his approach of restricting as much evidence as possible from being presented by the prosecution. He told defendant that several of the proposed witnesses are dead, while others were character witnesses who would allow the prosecution to expand the scope of evidence it could present against defendant. Lyman was still in the process of contacting all of the people on defendant's list. He had not found any evidence that abortion caused any type of mental health disorder but planned to highlight the timing of Jane's allegations happening after she was ejected from her grandmother's home following the abortion. Lyman had obtained the family law file and would be using it to show how Jane's mother orchestrated the allegations. He spent a lot of time on the case but was concerned about the health of his relationship with defendant in light of the *Marsden* motion.

Regarding disclosures to the prosecution, counsel admitted that he had attached a sealed declaration to his second continuance motion detailing defense reasons for the continuance, but the declaration was served not sealed. Lyman learned of it the following day, with the assigned prosecutor sealing the declaration herself and returning it to him.

When defendant brought up undisclosed evidence about the "Scott brothers," Martina's ex-boyfriend, a towing company, and videos possessed by the Auburn Police Department, Lyman replied he did not know what defendant was talking about, except for the Auburn police videos, which contained no relevant evidence.

The trial court denied the *Marsden* motion. Lyman then requested a continuance based on defendant's various complaints, which the trial court denied because defendant waited so long to make them. Defendant then made another *Marsden* motion, and the trial court set a hearing for February 13, 2020.

## 2. *February 13, 2020, Hearing*

Defendant opened the hearing by noting Lyman was appointed just over a year ago and had kept promising to send an investigator over regarding exculpatory evidence and to review the Auburn police videos. He had also failed to obtain a video of Jane's graduation speech and a yearbook; he had requested both for over a year. Defendant wanted a polygraph to prove his innocence and complained that he had received only two contact visits from Lyman. Defendant's primary grievance was that he had not been given a meaningful opportunity to participate in his defense. He also complained that at the last *Marsden* hearing, Lyman falsely told the court that defendant's brother did not have any convictions,

but subsequently told defendant he had not checked California. When Lyman did check California, he found, as defendant had said, that defendant's brother had a prior conviction. Defendant had also found on his own that his brother had two prior convictions in Oregon as well.

Defendant also questioned counsel's mental acuity and expressed that he cannot trust counsel to represent him because of counsel's political or social bias. He again brought up how the Placer County Public Defender's Office had served the prosecutor with privileged information that was supposed to be under seal. He found this and the other actions over the last two years had irreparably damaged his defense and the public defender firm, depriving him of his Sixth Amendment right to effective representation.

Lyman told the trial court he did not intend to go over what was covered in the last *Marsden* hearing. He and defendant had a difference of opinion on how the trial should be conducted. Counsel explained to defendant why they differed on numerous occasions, but defendant's opinion would not change. What counsel heard at this hearing was a different situation, as defendant believed he acted with a reckless disregard regarding some of his key witnesses, and defendant has a complete lack of trust or confidence in counsel, or his office, or both. Defendant felt betrayed and the relationship broken beyond repair, and the problems have not remedied themselves, even though Lyman and defendant had talked about their differences.

Lyman "flat out" denied falsely telling the court what he had learned about defendant's brother's background. According to counsel, defendant's assertion that he was working behind defendant's back "demonstrates a complete break. It is beyond irremediable. It is just gone."

Lyman denied having any leak in his office. Regarding the disclosure of confidential information to the District Attorney, he explained that the prosecutor brought it to the trial court's attention when the continuance motion was heard and told the trial court that she had stopped reading the material as soon as she realized it should have been sealed.

The trial court found there was insufficient evidence Lyman was or would be incompetent in his representation. Regarding the key issue, "whether there is such an irreconcilable conflict" that ineffective representation will result, the trial court found defense counsel is: "steward of the ship in terms of tactics. While there might be a disagreement, I respect that and understand that. Still, counsel is steward of the ship of that." The trial court noted in the context of the disagreement between defendant and counsel that defendant had a tendency to stray from the material issues, and that the court still had to rule over whether issues like the expert testimony on abortion would be admissible. There had not been sufficient showing that areas Lyman chose not to explore would be relevant to the case.

The court admonished counsel: "Mr. Lyman, I would expect that we all have thick skins. We are all subject to criticism. But as a professional, you are obligated to mount and to continue to mount a vigorous representation, and I would expect that to continue, notwithstanding the current *Marsden* motion. If that doesn't work, you need to let me know ...."

///

///

14

### 3. March 16, 2020, Hearing

The third *Marsden* hearing relevant to this case was heard during trial. Defendant referenced sanctions the trial court threatened to impose on counsel for not having a pharmacological expert witness ready to testify. Defendant again raised the video of Jane's graduation speech and told the trial court he had a witness who could establish Heather and Jane together discussed the case with his ex-wife.

Lyman replied that he decided to call the pharmacological expert only after hearing Jane and Alyssa's testimony, he had not been able to locate the graduation speech, and that this morning's testimony was expected to establish there were at least conversations among the sisters and their mother. Defendant told the court the eyewitness was a former jail inmate who saw Martina and Jane talking about the case. He also wanted an expert to rebut the CSAAS testimony.

The trial court denied the motion, finding counsel could make the arguments defendant raised and there was no ineffective representation.

### 4. May 14, 2020, Hearing

At this last *Marsden* hearing, defendant said he was communicating with outside counsel for a motion for a new trial. He also referenced the prior *Marsden* motions as demonstrating ineffective assistance of counsel. The trial court denied the motion.

### B. Analysis

As explained in *People v. Streeter* (2012) 54 Cal.4th 205, 230: "'When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden, supra,* 2 Cal.3d 118, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'" [Citation.] 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation.'" [Citation.] [¶] 'We review the denial of a *Marsden* motion for abuse of discretion.' [Citation.] 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.'" [Citation.]"

"A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.)

/ / /

/ / /

15

Dissatisfaction or conflict arising from defendant's own behavior or unfounded beliefs regarding counsel's competency does not create irreconcilable conflict. (*People v. Clark* (2011) 52 Cal.4th 856, 918 [the defendant cannot refuse to cooperate with otherwise competent counsel and demand substitution]; *People v. Smith* (1993) 6 Cal.4th 684, 688-689, 696-697 [conflict with, lack of confidence in, and not relating to counsel did not warrant substitution].) Further, to the extent there is a credibility determination between defendant's complaints and counsel's statements or explanations at a *Marsden* hearing, the trial court is " 'entitled to accept counsel's explanation.' [Citation.]" (*Smith*, at p. 696.)

Defendant asserts his disagreements with counsel were not tactical but "holistic" as they involved counsel's: failure to communicate with him regarding the defense, failure to call various witnesses; failure to provide discovery and inform him about defense strategy; counsel's choice of a defense strategy, and counsel's lack of preparedness. He finds many of these deficiencies were long-standing; potential witnesses defendant brought up for years, and many of the *Marsden* motions raising issues that had been raised (and not sufficiently addressed) in previous motions.

Defendant also finds the conflict with counsel was sufficiently great to justify granting *Marsden* relief at some point. Defendant notes his motions were "not made rapid-fire, but consistently over a period of several months." While admitting that he and Lyman had tried to work things out, defendant asserts the relationship "was past salvage" by the February 13, 2020, *Marsden* hearing. In support of this last argument, defendant notes counsel's own concerns about the relationship that counsel expressed at the January 29, 2020, and February 13, 2020, hearings. He concludes that the breakdown in the attorney-client relationship required granting the *Marsden* motion at the February 13, 2020, hearing.

The record does not support a finding that trial counsel was ineffective at the time of any of the *Marsden* hearings or at any other point during his representation. Counsel's responses to defendant's complaints and the trial court's inquiries at the *Marsden* hearings show he was mounting or in the process of mounting a vigorous, thoroughly researched, and thoroughly investigated defense. He showed that he was contacting some of the witnesses defendant sought, but others on defendant's lists were deceased, had not been found, or would not provide testimony relevant to the defense. Counsel also disputed defendant's claims he was not being kept informed about the defense; we defer to the trial court's implicit finding that trial counsel was more credible. Counsel likewise explained to the trial court how he had investigated the other evidence, and how he planned to use it, such as the family court file, or how it could not be found, like Jane's graduation speech, or how it was not relevant, like the Auburn Police Department videos. Notwithstanding defendant's protestations to the contrary, his dispute with counsel was essentially over trial tactics; *Marsden* does not entitle defendant to resolve such a dispute in his favor. (*People v. Welch, supra*, 20 Cal.4th at pp. 728-729.)

We also find it was within the trial court's discretion to conclude the relationship between defendant and counsel was so irreconcilable that ineffective representation was likely. Although the first two *Marsden* hearings showed a real conflict between defendant and counsel, subsequent events demonstrate that the conflict, if not entirely resolved, was significantly ameliorated. While trial counsel did state at the February 13, 2020, hearing that the relationship was broken beyond repair, the trial court did not have to accept counsel's representation. "However, counsel's

statement was based on what defendant had told the court and does not itself compel the court to grant new counsel. A defendant may not effectively veto an appointment of counsel by claiming a lack of trust in, or inability to get along with, the appointed attorney. [Citation.]" (*People v. Smith* (2003) 30 Cal.4th 581, 606.) Such is the case here. Counsel's statements at the February 13, 2020, hearing was prompted by defendant's own statements regarding his relationship with counsel. The trial court did not have to give defendant an effective veto over who represented him by allowing this type of conflict to force the trial court to grant the *Marsden* motion. The trial court's ruling, denying the motion while telling counsel to continue to represent defendant and to have a thick skin apparently worked. Counsel and defendant were able to work together to mount a vigorous defense subsequent to this hearing. Although defendant raised two more *Marsden* motions after this, those motions addressed only tactical differences, and the personal relationship between defendant and counsel appeared to be much better at those hearings.

It was not an abuse of discretion for the trial court to deny all four of the *Marsden* motions.

ECF No. 22-6, pgs. 11-17.

Here, the state court applied the proper federal legal principles, as announced by the United States Supreme Court, in evaluating Petition's <u>Marsden</u> claim. This Court, therefore, reviews to determine whether the state court's rejection of the claim was based on an unreasonable application of the law. The Court finds that it was not.

As explained above, denial of a <u>Marsden</u> motion amounts to a constitutional violation only where there was a conflict between counsel and the defendant which prevented effective representation. Such was not the case here. The trial court held no fewer than four hearings connected with Petitioner's <u>Marsden</u> motion. The record reflects that, despite disagreements between Petitioner and Mr. Lyman, Mr. Lyman nonetheless attempted to address Petitioner's complaints and counsel did in fact present a rigorous defense at trial, which included expert testimony challenging with various witnesses' memory. In this regard, it is telling that Petitioner has not raised any claims of ineffective assistance by Mr. Lyman.

**B.**     **<u>Admission of Pornography Evidence</u>**

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. <u>See</u> <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. <u>Middleton</u>, 768 F.2d at 1085; <u>see</u>

also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   To raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).   In any event, an evidentiary error is considered harmless if it did not have a substantial and injurious effect in determining the jury's verdict.  See Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002); see also Laboa v. Calderon, 224 F.3d 972, 976 (9th Cir. 2001).

Addressing Petitioner's claim that the trial court erred in admitting child pornography evidence, the California Court of Appeal sated as follows:

> Defendant's final contention is that the trial court committed a prejudicial abuse of discretion in admitting evidence of child pornographic images and search terms related to child pornography. [footnote omitted].
> In general, evidence of a defendant's conduct other than what is currently charged is not admissible to prove that the defendant has a criminal disposition or propensity. (Evid. Code, § 1101, subd. (a); *People v. Kipp* (1998) 18 Cal.4th 349, 369.) Evidence Code section 1108 contains an exception to that general rule and allows the trier of fact to consider uncharged sexual offense evidence as evidence of the defendant's propensity to commit sexual offenses and that the defendant committed the charged sexual offense. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160, 1164 (*Villatoro*); *People v. Falsetta* (1999) 21 Cal.4th 903, 912,

915, 922 (*Falsetta*).) Under Evidence Code section 1108, subdivision (a), evidence of the defendant's commission of another sexual offense or offenses is admissible in a case where the defendant is charged with a sexual offense, unless its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

In enacting Evidence Code section 1108, the Legislature recognized "'sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial [thus,] often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations.'[Citation.]" (*Villatoro, supra*, 54 Cal.4th at p. 1160.) Evidence Code section 1108 permits the trier of fact to consider evidence that the defendant has a propensity to commit sexual offenses in evaluating the defendant and the victim's credibility. (*Villatoro,* at p. 1164; *Falsetta, supra*, 21 Cal.4th at p. 911.)

* * *

The uncharged offense about which testimony was elicited, possession of child pornography (§ 311.11), is one of the crimes enumerated in Evidence Code section 1108, and therefore potentially admissible as propensity evidence. (Evid. Code, § 1108, subd. (d)(1)(A).) Defendant was charged with lewd acts on a minor (§ 288, subd. (a)), which punishes an act done "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child" (§ 288, subd. (a)) and using a minor to pose for sex acts (§ 311.4, subd. (c)), which "proscribes employing a minor to produce child pornography." (*People v. Cochran* (2002) 28 Cal.4th 396, 398.) The child pornography evidence is relevant to the section 288 offense to show a sexual interest in children, and possession of child pornography is manifestly relevant propensity evidence in support of a charge of producing child pornography. The internet searches were likewise relevant as showing an interest in child pornography.

Such evidence was not so prejudicial as to require exclusion under Evidence Code section 352. "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Child pornography is abhorrent and disturbing, but this evidence must be viewed in the context of the charged offenses, that defendant sexually abused his eldest daughter and younger great-nephew and used the boy to produce child pornography. Any prejudice within the meaning of Evidence Code section 352 was further diminished by the fact that the child pornographic images were not presented directly to the jury at trial. Detective Turner described the images to the jury, and the images were placed in a manilla envelope labeled "explicit images." Since the cell phone searches did not involve such images, their admission was even less prejudicial and was likewise properly admitted.

We also reject defendant's contention that the adult pornographic and erotica images were improperly admitted over his objection. The adult pornography shows defendant had such images, partially corroborating John's testimony that he showed such images to him. The other images,

19

1   with their theme of crotches and armpits was consistent with John's
2   description of many of his poses and shows these poses and the photos of
    John with exposed armpits found in defendant's possession were
3   motivated by a sexual interest in the boy, making them relevant to the
    section 311.4 charge and the section 288 charges involving John. These
4   images were not prejudicial in light of the charges and the properly
    admitted child pornography evidence, and it was not an abuse of discretion
    to admit them.

5   ECF No. 22-6, pgs. 17-20.

6

7           As explained above, claims challenging a state court's evidentiary rulings which

8   are based on application of state law, as here, are generally not cognizable on federal habeas

9   review.  An exception lies where the error alleged resulted in a complete miscarriage of justice.

10  Moreover, any error is harmless unless it had a substantial and injurious effect on the verdict.

11          Here, the Court finds that any error was harmless.  As the Court of Appeal noted,

12  the explicit images depicting child pornography were only described to the jury and not actually

13  presented to the jury.  This mitigates any prejudice that the images themselves would have

14  created had they been viewed by the jury.  Further, as the facts outlined by the Court of Appeal

15  demonstrate, there was ample evidence of guilt based on the testimony of the victims and other

16  evidence adduced at trial directly relating to Petitioner's abuse of the victims on numerous

17  occasions over the course of many years.  Thus, even if the child and adult pornography images

18  were improperly admitted, the jury's verdict remains sound based on other more direct evidence.

19  Given the record as a whole, this Court cannot say that any error, if error occurred at all, had a

20  substantial and injurious effect on the verdict such that admission of the pornography images

21  resulted in a complete miscarriage of justice in violation of Petitioner's Fourteenth Amendment

22  due process rights.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

### III. CONCLUSION

The Court has determined that federal habeas relief is not warranted.  Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the Court has considered whether to issue a certificate of appealability.  Before Petitioner can appeal this decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  Where the petition is denied on the merits, a certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue.  See Fed. R. App. P. 22(b).  Where the petition is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can show: (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"  Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)).  For the reasons set forth herein, the Court finds that issuance of a certificate of appealability is not warranted in this case.

Accordingly, IT IS HEREBY ORDERED as follows:

1.    Petitioner's petition for a writ of habeas corpus, ECF No. 1, is DENIED.

2.    The Court DECLINES to issue a certificate of appealability.

3.    The Clerk of the Court is directed to enter judgment and close this file.

Dated:  July 31, 2024

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

21